Filed 1/12/26  P. v. Li CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM LI,<br><br>    Defendant and Appellant. | F086222<br><br>(Super. Ct. No. 17-CR-01969)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on December 17, 2025, be modified in the following particulars:

1.  On page 3, delete the fifth full paragraph that begins "Super also explained that death by strangulation" and insert the following paragraph in its place:

> The prosecutor asked Super how long it takes to strangle someone to death "with your hands around their neck," and he answered, "It takes about five to six minutes, somewhere around five minutes of compression.  So those vessels not only have to be compressed, but they have to stay compressed for the brain to run out of oxygen."  He added that "there has got to be a good five minutes of uninterrupted compression to result in death."

2.	On page 14, delete the third full paragraph under heading **2. Malice** that begins "Intent to kill may be inferred" and insert the following four paragraphs in its place:

Intent to kill may be inferred from the circumstances of the crime. (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.)  Here, Li's intent to kill Wang can be inferred from the manner of death—strangulation.  Evidence showed Wang died after having constant pressure applied to her neck for five to six minutes.  True, the method of strangulation was unspecified; the forensic pathologist, Dr. Super, testified Wang could have been strangled with hands, a knee, a soft ligature, or by some other method.  But Super's testimony was unequivocal that Wang was strangled to death.  The jury could reasonably infer from the length of time it took to kill her that the killer acted intentionally.  There was thus substantial evidence of express malice.

Li asserts that Super's testimony proves only that *manual* strangulation takes five to six minutes to cause death, not that all methods of strangulation take that long.  During the trial, the prosecutor asked Super how long it would take to strangle someone to death "with your hands."  Super replied:  "It takes about five to six minutes of compression.  So those [blood] vessels not only have to be compressed, but they have to stay compressed for the brain to run out of oxygen.  [¶]  The key to the whole thing is the oxygen delivered to the brain."  He clarified that there must be "a good five minutes of uninterrupted compression to result in death."

Li argues that since Super was asked specifically about manual strangulation, his answer of five to six minutes is limited to that method.  He raises the possibility that other methods of strangulation can cause death much sooner, and since the method used in this case was never conclusively proven, any conclusion that the act took five to six minutes is impermissibly speculative.

We disagree.  It is readily inferable that Super's five-to-six minute timeframe describes a biological constant regarding the brain rather than a mechanical variable regarding the assailant's grip.  It can be deduced from Super's testimony that whether the blood vessels are occluded by hand, ligature, or some other object, the brain's survival threshold does not change.  Therefore, the jury could reasonably infer that Wang's death by strangulation, whatever the method, took at least five to six minutes of deprivation of oxygen to the brain.

2.

3. On page 16, delete the first full paragraph that begins "Generally, three categories of evidence" and insert the following paragraph in its place:

In assessing the sufficiency of the evidence of premeditation and deliberation, a reviewing court typically analyzes three categories of evidence: (1) planning activity — "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; (2) motive — "facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim"; and (3) manner of killing — "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27.) However, these factors "are not elements of premeditation and deliberation." (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10 (*Shamblin*).) They are descriptive guidelines and "need not [be] accord[ed] … any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

4. On page 17, in the partial paragraph at the top of the page, delete the full cite to "*People v. Shamblin*" and insert the following short cite in its place:

(*Shamblin, supra,* 236 Cal.App. 4th at p. 11.)

There is no change in the judgment. Appellant's petition for rehearing is denied.

3.

SNAUFFER, J.

WE CONCUR:

FRANSON, Acting P. J.

DE SANTOS, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>WILLIAM LI,<br><br>    Defendant and Appellant. | F086222<br><br>(Super. Ct. No. 17-CR-01969)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

Bay Area Criminal Lawyers, David J. Cohen and Clint C. Christoffersen, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant William Li was convicted by a jury of first degree murder and sentenced to 25 years to life.  He asserts many claims challenging his conviction.  We affirm the judgment.

STATEMENT OF THE CASE

The Merced County District Attorney charged Li in a first amended information with one count of murder (Pen. Code,[1] § 187, subd. (a).)  A jury convicted him of first degree murder under a premeditation theory.  On March 22, 2023, the trial court sentenced him to 25 years to life.

## FACTS

### I.     Prosecution's case

Around 6:30 a.m. on February 6, 2017,[2] the body of a woman, later identified as Lijun Wang, was found in a dumpster behind a Rite Aid in Merced.  She was in the fetal position and wrapped in three plastic garbage bags.  She wore blue jeans and a silver puffy jacket, and there was blood around her face, nose, and mouth.  Wang had a receipt in her jacket pocket from a Draeger's Market in San Mateo dated February 5 at 10:19 a.m.  Surveillance footage from Draeger's Market showed Wang inside the store shortly after 10:00 a.m. on February 5, wearing the same clothes that were found on her in the dumpster.

On February 7, Dr. Mark Super, a forensic pathologist, performed the autopsy.  There were chips of white paint on the skin of Wang's back and in her hair.  There were also paint chips in the bags which contained her body.  From her neck up, Wang had "pinpoint hemorrhages all through her skin," which meant that "something had interrupted her vascular supply from her neck up."  Her face was "plethoric," meaning "congested."  She had large hemorrhages in her eyelids and the whites of her eyes, and she had two bruises on the left side of her neck and some bruising on the right side as well.  She had minor bruises on the inside of her upper and lower lips.  There was a frothy, bloody, mucous-like material coming from her nose and mouth.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Further references to dates are to the year 2017, unless otherwise stated.

Wang's bruising was nonfatal, but it told Super "a lot" about how she died. Super testified "she was assaulted about her neck somehow. Something was clutching or compressing her neck in such a way that the blood vessels—the blood was not able to either get from her heart to her brain, or, once it got to her brain, it wasn't able to get back. So, either way, the oxygen supply to her brain was interrupted such that she died, which is asphyxia." The hemorrhaging under her eyelids was a "telltale" sign of "death by neck compression." He also explained that frothy fluid from the nose and mouth result from being asphyxiated, occurring when the lungs become engorged with blood. The bruising in Wang's gums showed there had been impact to her face.

Super did not see a "definite ligature mark." A ligature is "anything that's around the neck—electrical cord, necktie, sometimes their own clothing is wrapped." In a strangulation, the mark left on the skin by the ligature does not "angle upward like in a hanging." Instead, the mark stays "relatively horizontal." The object used can sometimes be identified by a pattern visible in a ligature mark.

Wang also had a bruise in her upper forehead, which would have been caused by a nonfatal impact. There was also a deep contusion in her right shoulder, which was caused by an impact hard enough to cause bleeding deep in the muscle. A punch, kick, or forceful slam into a firm surface could have caused that injury.

Super stated that the bruising around Wang's neck showed "definite assault about the neck, not just impacts that show on the skin. But this is squeezing, compression enough to crush blood vessels in muscle, which causes bruising, which would be definite enough to compress the vessels and cause someone to die." Super also explained that death by strangulation takes "several minutes. It takes about five to six minutes, somewhere around five minutes of compression. So those vessels not only have to be compressed, but they have to stay compressed for the brain to run out of oxygen." He

3.

added that "there has got to be a good five minutes of uninterrupted compression to result in death."

Super could not determine how Wang was strangled, which is why he "kept the cause of death fairly nonspecific." He explained that in "some manual strangulations, there's actually finger marks," but here "the injuries are not such that [he could] tell." However, he determined the cause of death to be asphyxia by neck compression. He explained: "[S]omehow her neck was compressed by—it could have been a manual strangulation. It could have been a soft ligature that didn't leave a mark. It could have been somebody's knee, maybe some other way that her neck was compressed. But her neck was compressed long enough that her brain was—her oxygen supply to her brain was interrupted and she died." He also classified the death as "clearly a homicide" because "there's no evidence that [Wang] has done this to herself. There's no evidence this is something she did by herself. This is clearly not accidental. So she died at the hands of some other person. So this is a homicide, in my opinion."

After police identified Wang as the victim, they went to an address on Capewood Lane in San Jose which was listed on Wang's California identification card. Officers spoke with a woman at the house named Jing Huang. Huang testified she owned the house, had lived there for 20 years, and rented bedrooms out to tenants. She said Wang had lived there for five days. Someone brought Wang to her, but she could not remember who they were.

According to one of the officers, Huang appeared to be in her mid-40s, and the other women in the house looked to be early 20s. Many of the people in the house did not speak English; they spoke Chinese. One of the rooms contained four twin beds, and a young girl in that room appeared nervous at the presence of police. The house occupants at first denied knowing Wang, but later said they knew who she was.

4.

Huang testified that prostitutes had stayed before at her house. She explained that sometimes the "bosses" would hold passports for these girls and that the girls sometimes developed romantic relationships with customers. She had seen some of the girls marry customers. Huang would answer the phone and make appointments for customers who wanted to come see a girl. She testified she did not know Li and did not know whether he was one of Wang's customers. On cross-examination, Huang said she did not remember telling officers that the "bosses" were upset at Wang because she was not paying them what she owed.

Wang was involved in a prostitution investigation in Hayward in March 2016. Detectives went to a home and found Wang there naked with a man. The bedrooms in the house were set up for prostitution work, and officers found items like lubricant, condoms, and pay-owe sheets.

Officers obtained Wang's phone number from immigration documents, and they were able to confirm the this was her phone number by contacting one of her friends. They also learned she had applied for political asylum. According to her application, Wang was a Chinese national, born July 2, 1986.[3] Her address was listed as 143 Harold Avenue in San Francisco. The application was signed October 3, 2016, and Wang stated in the application that she had lived at the Harold Avenue address since January 2016 and that she previously lived there from May 2015 to September 2015.

Wang's cell phone service provider was T-Mobile. According to her records, her "top caller" was Li's phone number. Li lived at 148 Harold Avenue in San Francisco and had an auto body shop in San Mateo. Over the 10-month period covered by the records, there were 1,077 communications, either calls or texts, between Li's phone and Wang's phone. On Sunday, February 5, Li called Wang at 9:28 a.m., Wang called Li at 10:55

_____

[3] If this date of birth is correct, she was 31 years old when she died.

5.

a.m., and Li called Wang at 11:14 a.m. Cell site records showed that the 10:55 and 11:14 calls were made in San Mateo, near the Draeger's Market where Wang shopped and Li's auto shop. There were no communications between their phones after the 11:14 a.m. call.

Cell site records showed Li's phone had activity on February 5 at 1:22 p.m. and 1:29 p.m. in San Mateo and at 3:45 p.m. in San Jose. Sometime after 5:00 p.m., Wang's phone connected to a cell site in Hollister, then a site in Los Banos, and finally to a site in Merced at 6:45 p.m. Li's phone followed a similar pattern, ultimately connecting to a cell site in Merced at 6:49 p.m. Neither Li's nor Wang's phone had previously pinged a cell site in the Merced area.

Wang's phone later connected to a cell site in the Burlingame area at 9:47 p.m., and Li's phone connected to a cell site in San Francisco at 11:39 p.m. At 12:15 a.m., 12:46 a.m., 4:29 a.m., and 9:31 a.m. on February 6, Wang's phone connected with a cell site in the San Francisco area. Li's phone also connected in the San Francisco area that morning.

In April 2017, police searched Li's house in San Francisco and shop in San Mateo. At Li's shop they found a cell phone, a surveillance system, computers, heavy-duty garbage bags, and title to Li's 2001 Mercedes. The car was also there. Police also noticed that the floor of Li's shop had been painted and that "a lot of the floor had been flaked away." There were loose paint chips on the floor which looked to be the same color as those found on Wang's body and in the bags in which she was wrapped. Li was arrested at the shop.

Police seized Li's Mercedes and found paint chips in the trunk similar to those found during the autopsy. A Department of Justice criminalist, Gina Williams, analyzed the paint chip samples found during the autopsy and those found in Li's trunk and determined they were indistinguishable from each other. Williams also determined that

all these paint chip samples were "similar in all their tested characteristics" to the samples taken from the floor of Li's auto shop.

Video surveillance footage of the alley behind the Rite Aid where Wang's body was found showed a sedan similar to Li's Mercedes in the alley at 7:49 p.m. on February 5.

Forensic examinations were performed of Li's phone, the surveillance system from his shop, and the computers seized from his home and shop. Wang's number was saved in his phone under the name "Kik Ki," but the messages between them had been deleted. The surveillance system footage went back only to March 3.

The examination of Li's laptop showed that he had searched the internet for "How to delete my phone call history from Sprint phone" on April 4. Sprint was his cell phone service provider. Two days earlier, there was an internet search which listed Wang's phone number followed by, "[W]hich phone company?" There were searches related to the Merced Sun Star, a local newspaper, on February 9, March 26, April 1, and April 2. On March 11, there were searches for "Backpage, San Jose," which was for prostitution. On February 7 there was a search for "What is autopsy."

Li's internet search history showed a Facebook search on February 25 for "police stations in Merced, California." There were also searches for the Merced Sun Star on YouTube. There were also searches on deleting Sprint call records and a search titled, "How do I remove call log from bill, Sprint."

Also on Li's computer was a Wikipedia search for "Merced, California" on February 2, four days before Wang was found dead. There were also photos on his computer that a police officer thought were related to prostitution, and there were also pornographic photos on the device.

The computer taken from Li's auto shop contained internet searches for "Merced New" on February 14 and 15. A cached image on the computer showed the Merced

intersection where the Rite Aid stood, behind which Wang was found.[4] It might have been a cached image of a Google Earth search. There were other cached images of mapping of the Bay Area and of the city of Merced. One cached image showed the Merced shopping center containing the Rite Aid, and there was "a red tear-drop icon" on the Rite Aid. The icon could "denote a destination point, also, a search for that specific address." The only way these cached images would have been on the computer is if they had been searched for and viewed. It was not known, though, when they were viewed.

S.H. owned the auto shop next to Li's. He had known Li for a few years and described him as a "great neighbor." He said Li came to his shop on February 6 (Monday) or 7 (Tuesday) asking to see his surveillance footage because someone had broken into his (Li's) car. S.H. allowed Li to view the footage, and Li was inside for about half an hour. About 10 days later, S.H. checked his surveillance system and saw that "everything was gone." The system could hold about 30 days of footage and everything had been erased. Around that same time, S.H. went over to Li's shop and noticed that only a portion of Li's shop floor had been painted.

G.T. met Wang in 2014 or 2015 at a dinner party at a restaurant in New York. He exchanged messages with Wang on February 5, which was Super Bowl Sunday. The messaging conversation began before the Super Bowl started, and Wang did not respond to messages G.T. sent later in the day. But later, he received a message from Wang stating, "I went to LA." He asked why she did not tell him, and she said, "I am with friends. Be back in two weeks." G.T. sent her more messages, and she replied, "I cannot use my phone. There's something wrong with my phone." Wang also sent another

_____

[4] The testifying police officer explained that when a computer connects to a website, the site will transfer data to the computer "to basically speed up the process were you to visit the website again. So it stores these cache image files on the device."

8.

message saying she had gone to Canada. These messages were sent after Wang's body had been found.

Li was interviewed by Sergeant Jeffrey Horn on April 14 at the San Mateo police department after he was arrested. A video recording of the interview was played for the jury. Li admitted he lived at 143 Harold Avenue in San Francisco. He said he did not travel for work and had not travelled "for long time." Horn asked if he had ever been to Merced, and Li said no. Li said he watched the Super Bowl that year at home.

Horn asked Li if he knew a woman named Lijun Wang. Li said, "Lijun Wang, Lijun Wang, Lijun Wang, yeah it's a, Asian girl or something like that[.]" Horn asked if a picture would help, and Li said it would. Li looked at the picture and said he knew her from the "massage place." Horn asked if she was his girlfriend, and Li said, "No, I wish." Horn asked, "You wish?" Li replied, "No, no I don't."

Li said he got massages from Wang but never had sex with her. He said he talked on the phone with her only a "couple times." Horn then told Li that he talked to Wang almost four times a day for ten months and asked if he had talked to her recently. Li explained that Wang told him on Super Bowl Sunday that she was leaving for New York, and he hadn't spoken to her since then. He denied ever travelling with her but admitted having taken her to dinner a couple of times.

Li admitted he called Wang twice on Super Bowl Sunday and said she asked him to bring her passport to her because she needed to go to New York. He said he brought her passport. Horn showed Li cell site records showing that his and Wang's phones traveled together on Super Bowl Sunday to Merced. Horn also showed Li surveillance footage of what looked like his car in Merced. Li asked if Wang was "still alive," and Horn said no. Li said, "No kidding?" He also said it was "unbelievable" that his car was on video where Wang's body was found.

9.

## II.     Defense case

Eric Wong was an auto mechanic who had known Li for six or seven years. He worked at an auto shop near Li's and would sometimes borrow tools from him. He said he went to Li's shop on Sunday, February 5, between 12:00 p.m. and 2:00 p.m. and spoke with Li for about 15 minutes. He did not see anyone there besides Li and did not notice anything unusual.

Li's brother-in-law, Lawrence Tam, testified he knew Li to be a calm and very patient person. He never saw Li yell or act violently toward anyone. Li's other brother-in-law, Peter Louie, was married to Li's sister. Louie and Li's sister owned the auto shop Li worked at. He testified Li was a "very mellow and calm person," and he had never seen Li get angry or raise his voice. He also testified on cross-examination that he had never used the shop computer to search for addresses in Merced or to search for how to delete call history.

## DISCUSSION

## I.     Corpus delicti

Li contends the evidence presented failed to establish the corpus delicti of the offense of murder. We disagree.

The corpus delicti rule mandates that in every prosecution, the corpus delicti—the body of the crime itself—must be established by evidence other than extrajudicial admissions by the defendant. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 (*Alvarez*).) The rule "is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Id.* at p. 1169.) Corpus delicti is established when it is shown that a crime has been committed by someone, and the rule consists of two elements: (1) the injury or harm, and (2) a criminal agency causing that harm to exist. (*People v. Jones* (1998) 17 Cal.4th 279, 301; *People v. Zapien*

(1993) 4 Cal.4th 929, 985–986.) "[I]dentity is not an element of a crime for corpus delicti purposes." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1431.)

"[T]he quantum of evidence the People must produce in order to satisfy the corpus delicti rule is quite modest; case law describes it as a 'slight or prima facie' showing." (*People v. Jennings* (1991) 53 Cal.3d 334, 368 (*Jennings*).) "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Alvarez*, *supra*, 27 Cal.4th at p. 1171.)

The People here produced enough evidence to make a "slight or prima facie showing" of both (1) harm and (2) criminal agency to satisfy the corpus delicti rule. (*Jennings, supra,* 53 Cal.3d at p. 368.) The discovery of Wang's body satisfies the harm element, and there was sufficient evidence to show she was murdered. Evidence showed she was killed by having had constant pressure applied to her neck for five to six minutes, and no evidence showed she asphyxiated herself. The manner in which her body was found also supports that she was murdered. She was wrapped in garbage bags and thrown into a dumpster in a different city far from where she lived. If she died accidentally or by suicide, it is unlikely someone would feel the need to do such a thing to her corpse. There were also the facts that Li had conducted internet searches of Merced before Wang died, that cell site records showed he had Wang's phone after she died, and that he researched how to delete phone records after she died. There was more than enough evidence to satisfy the corpus delicti rule.

11.

## II.     Sufficiency of the evidence

Li raises three sufficiency of the evidence claims relating to his murder conviction. He claims no substantial supports that he was Wang's killer, that the killing was committed with malice, or that the killing was committed with premeditation and deliberation.  We reject all these claims.

### A.     Standard of review

We first set out the substantial evidence standard of review, which applies to all three of Li's substantial evidence claims.  A reviewing court faced with a substantial evidence claim "determines 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]  We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]  Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]  This standard applies whether direct or circumstantial evidence is involved.  'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]'  'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

#### 1.     Identity

Li first claims no substantial evidence supports the jury's finding that he was the one who murdered Wang.  He asserts there is "nothing to tie [him] directly to [Wang's]

12.

death." He posits that she might have committed suicide and Li found her dead, or that someone else killed her and forced Li to get rid of her body. He also postulates that maybe they "had sex on the floor of his shop before driving to Merced for a date far from the prying eyes of friends and family in the Bay Area, with her deciding to stay the night with friends and being killed by some unidentified individual in the Merced area. He argues that the evidence tying him to Li's death "is so thin that none of these possibilities can be eliminated. These other explanations are not undermined by any of the evidence present[ed] at trial, and, for this reason, the evidence that Mr. Li was the killer was insufficient."

Li's argument is out of step with the deferential substantial evidence standard of review. It does not matter that the evidence cannot disprove any of Li's speculative theories of how Wang died. The question is whether evidence supported the jury's finding that Li killed her, and the answer is yes.

Evidence showed that Wang purchased something at a grocery store in San Mateo near Li's shop on February 5 at 10:19 a.m. and that Li called Wang for the last time at 11:14 a.m. Both their phones connected to a cell site in Merced around 6:45 p.m. Paint chips from Li's shop were on Wang's body, and when her body was discovered, she was dressed in the same clothes she was wearing inside Draeger's Market. Li took and kept Wang's cellphone. Li searched the internet for Merced in the days before Wang died and also researched how to delete his cell phone call history.

From the internet searches for Merced, the jury could reasonably infer that Li planned days in advance to kill Wang and dump her body in Merced. The paint chips found in Wang's hair and on the skin of her back support a finding that she was in Li's auto shop on February 5, and the jury could infer she went there after leaving Draeger's Market. The jury could then infer that Li killed Wang over the next few hours, bagged

13.

her body, and drove to Merced to dump her, just as he had planned. The evidence thus supports a finding that it was Li who killed Wang, not someone else.

### 2. *Malice*

Li also argues no evidence supported a finding that he killed Wang with malice. He asserts there was no evidence of how or when she was killed, or of how many people were involved in her death, and thus there were no facts on which to base a malice finding. We disagree.

"A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Express malice requires an intent to kill "unlawfully." (§ 188, subd. (a)(1).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Express malice requires a showing the assailant either desires the result— that is, death—or knows to a substantial certainty that death will occur. (*People v. Davenport* (1985) 41 Cal.3d 247, 262.)

Intent to kill may be inferred from the circumstances of the crime. (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.) Here, Li's intent to kill Wang can be inferred from the manner of death—strangulation. Evidence showed Wang died after having constant pressure applied to her neck for five to six minutes. True, the method of strangulation was unknown; the forensic pathologist testified Wang could have been strangled with hands, a knee, a soft ligature, or some other thing. But the pathologist's testimony was unequivocal that Wang was strangled to death. The jury could reasonably infer from the long time it took to kill her that the killer acted intentionally. There was thus substantial evidence of express malice.

14.

### 3. *Premeditation and deliberation*

Li also argues there was insufficient evidence of premeditation and deliberation. We again disagree.

Conduct is premeditated if " ' " ' "considered beforehand" ' " ' " and deliberate if " ' " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88.) " ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*Ibid.*)

Generally, three categories of evidence establish premeditation and deliberation: (1) planning activity — "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; (2) motive — "facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim"; and (3) manner of killing — "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27.)

Here, evidence of planning activity and of the manner of killing support a finding of premeditation and deliberation. As to planning activity, evidence showed that Li searched the internet for Merced days before Wang died, which supports an inference of a plan to dump her body there after killing her.

With respect to the manner of killing, Wang died as a result of strangulation. Whether murder by manual strangulation supports an inference of premeditation and

15.

deliberation is a fact-specific inquiry. "This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020.) "[W]here strangulation occurs over a prolonged period of time, a rational juror could find that the killer committed a premeditated and deliberate murder." (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 11.) In *Shamblin*, the expert testimony showed the manual strangulation could have taken one to five minutes, and in *Hovarter* the evidence showed the defendant strangled the victim for five to eight minutes. (*Shamblin*, at p. 11; *Hovarter*, at pp. 1019–1020.) The appellate courts in both these cases found sufficient evidence of premeditation and deliberation. (*Shamblin*, at p. 11; *Hovarter*, at pp. 1019–1020.)

Here, the expert testimony was that Wang was strangled for five or six interrupted minutes. "This evidence suggests [Li] had ample opportunity to consider the deadly consequences of his action." (*People v. Stitely* (2005) 35 Cal.4th 514, 544 [defendant applied lethal pressure to victim's neck for "a 'long' time"]; see *People v. Davis* (1995) 10 Cal.4th 463, 510 [strangulation of sexual assault victim for up to five minutes suggested deliberate plan to kill her].) There was thus sufficient evidence to support the verdict.

## III.  Li's statement to police

Li unsuccessfully moved in limine to exclude his statement to Sergeant Horn on the ground he did not knowingly and intelligently waive his *Miranda*[5] rights, which were read to him in English. He asserted he was not proficient enough in English to "fully understand" his rights. He maintains the trial court erred in denying his motion to exclude his statement. We disagree.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602] (*Miranda*).

**A.     Background**

Horn began his interview with Li by saying he was going to read Li his rights because he (Horn) did not want Li to think he was "trying to be sneaky or nothing[.]"  Li affirmatively replied, "Uh-huh."  The following ensued:

> "HORN:  Alright, you have the right to remain silent, do you understand?

> "LI:  Uh-huh (affirmative).

> "HORN:  Anything you say may be used against you in court, do you understand?

> "LI:  Uh-huh (affirmative).  I might, ah, I might, ah, I might in-in-(breath) inst-in, interpreter, you know …

> "HORN:  Interpreter?

> "LI:  Interpreter, (covered) …

> "HORN:  Okay, if we get bad, if you get bad and there's …

> "LI:  Yeah.

> "HORN:  … something you don't understand …

> "LI:  Yeah.

> "HORN:  … please let me know …

> "LI:  Okay, yeah.

> "HORN:  Okay?  You have the right to have an attorney present before and during any questioning.

> "LI:  Uh-huh.

> "HORN:  If you cannot afford an attorney one will be appointed to represent you, free of charge before any questioning if you wish, you understand all of that?'

> "LI:  Oh, yeah, yeah.

17.

"HORN:  Okay."

The interview continued for 20 minutes, and Li never asked for an interpreter. After conversing for that long, Horn told Li that the district attorney had already filed a case against him and that this was his only chance to say what happened to Wang.  Horn said Li's assertion he had nothing to do with Wang's death was "not gonna work."  Li said to that, "Yeah, I need to get the attorney or someone[.]"  Horn asked if Li wanted to get an attorney, Li said yes, and the interview ended.

Li moved in limine to exclude his statement to Horn on the ground he did not knowingly and intelligently waive his *Miranda* rights, which were read to him in English. He asserted he was not proficient enough in English to "fully understand" his rights.  He testified at the hearing on the motion, which was held April 22, 2021.  He was assisted at the hearing, and throughout the rest of the trial proceedings, by a Cantonese[6] interpreter.

Li testified he was born in China in 1966 and moved to the United States in 1984. Chinese was his first language, and he studied English in high school in his first three years in the United States.  He was enrolled in "English as a second language" classes. He studied English for an additional year in adult school.  He was married for 25 years, his wife having died the year before, and he spoke with her in Chinese.  He understands English "a little," and there was "much" he did not understand in his interview with Detective Horn.

On cross-examination, the prosecutor asked Li about how he had asked Detective Horn for an attorney during his interview.  Li said he knew how to do so from watching television.  He also watched a lot of sports on television in English.  He worked throughout his time in the United States in South San Francisco and other parts of the Bay Area, speaking with his coworkers in English.  He also spoke with the customers at

---

[6] Cantonese is a Chinese dialect.

18.

his auto shop in English, though he only occasionally had to speak with customers. He sometimes searched the internet in English.

The trial court heard argument from the parties and stated that it had read Li's motion in limine and had watched and read the transcript of Li's interview with Horn. The court found there was a "clear understanding and rapport" between Horn and Li during the interview. The two "clearly understood each other, were talking about subjects, arguably some more sophisticated[.]" The court noted that Li was able to spell out his home address. Li responded appropriately to Horn's questions. Li said he "might" want an interpreter, and Horn said he would "accommodate that if they had a problem." The court also found that Li received the proper advisements of his rights. The court denied Li's motion, concluding Li understood his *Miranda* rights and knowingly and intelligently waived them and "voluntarily spoke" with Horn.

## B.     Issue and analysis

At the outset, we observe that Li expressly concedes that he waived his *Miranda* rights. Li acknowledged during his interview with Horn that he understood his rights, but he never expressly waived his rights; and Horn never asked him if he waived his rights. Thus, Li must be conceding that he waived his rights implicitly. (*People v. Nelson* (2012) 53 Cal.4th 367, 375 [*Miranda* rights may be waived implicitly].) The question then is whether this implied waiver was made knowingly and intelligently. Li maintains that his waiver was not knowingly and intelligently made because he was not proficient enough in English to understand his rights as they were read to him.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself[.]" (U.S. Const., 5th Amend.) *Miranda* held that a defendant in custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to be presence of an attorney, and that

19.

if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra,* 384 U.S. at p. 479.)

A defendant may waive these rights so long as the waiver is voluntary, knowing, and intelligent. (*Miranda, supra,* 384 U.S. at p. 444.) " 'First, the relinquishment of the right must have been voluntarily in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " (*People v. Clark* (1993) 5 Cal.4th 950, 986, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Language difficulties encountered by the defendant are relevant in determining if there has been a valid waiver. (See *United States v. Heredia-Fernandez* (9th Cir. 1985) 756 F.2d 1412, 1415, cert. den. (1985) 474 U.S. 836 [106 S.Ct. 110]; see also *United States v. Gonzales* (9th Cir. 1984) 749 F.2d 1329, 1335–1336.)

We compare the facts here to those of other cases where a waiver of *Miranda* rights read in English was found to be valid. In *United States v. Bernard S.* (9th Cir. 1986) 795 F.2d 749 (*Bernard S.*), although the defendant's native language was Apache and his English skills were deficient to the point that an interpreter had been used during trial, the court found that the defendant had knowingly and intelligently waived his rights that were read to him in English. (*Id.* at pp. 751–752.) An FBI agent questioned the defendant at the police department, and the defendant's mother and another police officer, who both spoke Apache, were also present. (*Id.* at p. 751.) The agent read the defendant his *Miranda* rights from a standard form in English, and the defendant said he understood and was willing to waive his rights. (*Ibid.*) The defendant asked for some

20.

things to be explained to him in Apache during the interview, but after he waived his rights. (*Ibid.*) The defendant answered the FBI's questions in English and made incriminating statements which he unsuccessfully moved to exclude before trial. (*Ibid.*)

The *Bernard S.* court found substantial evidence of a valid waiver. (*Bernard S., supra,* 795 F.2d at p. 752.) Although the defendant had some difficulty with English and testified that he neither read nor wrote English, he admitted having studied English through the seventh grade, and he answered the FBI agent's questions in English. (*Ibid.*) "Most importantly," the defendant stated he understood his rights, and at no time indicated he did not understand his rights. (*Ibid.*)

In *Campaneria v. Reid* (2d Cir. 1989) 891 F.2d 1014 (*Campaneria*), the appellate court found that while a manslaughter suspect had limited proficiency in speaking English, he nevertheless had displayed in a recorded interview a sufficient command of it to have understood the *Miranda* warnings read to him and had voluntarily waived those rights. (*Id.* at pp. 1016–1017.) The defendant, who had emigrated from Cuba three years earlier, was read his rights in English and said he understood them and was willing to answer questions. (*Id.* at p. 1017–1018.) He made a statement, primarily in English though occasionally lapsing into Spanish. (*Id.* at p. 1017.) He was interviewed several more times by police, each time being read his *Miranda* rights in English. (*Ibid.*) He spoke in broken but understandable English, again sometimes lapsing into Spanish. (*Ibid.*)

The *Campaneria* defendant argued that because of his poor grasp of English and the confusing circumstances of the questioning, he had not validly waived his *Miranda* rights. (*Campaneria, supra,* 891 F.2d at p. 1020.) He testified that he had asked an officer to stop the interview because he did not understand English. (*Id.* at p. 1018.) Even so, the appellate court found his claim unpersuasive, holding that his command of

21.

English was sufficient for him to have understood the *Miranda* warnings given to him. (*Id.* at p. 1020.)

In *United States v. Sriyuth* (3d Cir. 1996) 98 F.3d 739 (*Sriyuth*), the court found that a Thai immigrant had understood warnings administered to him in English. (*Id.* at pp. 742, 750.) Officers arrested the defendant for raping and kidnapping a woman and talked with him in English; one agent later testified that he was "absolutely certain" that the defendant understood him and that he did not have any trouble understanding the defendant, who spoke English. (*Id.* at pp. 744, 749.) Defendant said he wanted to talk about the events, at which point police administered the waiver of right forms to him. (*Ibid.*) He stated he understood his rights but later contested the substance of his statement to the agent as contained in an FBI report. (*Ibid.*) He testified he was 23 years old, had attended five years of high school in the United States, was not familiar with the criminal justice system, but knew he was entitled to a lawyer upon arrest from watching movies and television. (*Ibid.*) The appellate court determined that the facts supported the lower court's denial of the suppression motion because the defendant had waived his rights freely and deliberately. (*Ibid.*)

Li does not direct us to any portion of the record that would demonstrate confusion, hesitancy, or inability to understand his rights as Horn read them to him. To the contrary, Li told Horn that he understood each of his rights and did not ask Horn any questions about his rights. And while Horn was reading Li his rights, Li said he only "might" need an interpreter, and Horn told Li to "please let [him] know" if Li did not understand something. Li never requested an interpreter during the interview, and the interview ended when Li invoked his right to an attorney. Like the trial court, we observe that Li responded appropriately to Horn's questions during the interview. Horn never threatened Li or used any intimidating tactics during the interview. Nothing in the record suggests any reason why Li would say he understood his rights when he actually did not.

To be sure, a defendant could misunderstand their rights because of a language barrier but not learn about their misunderstanding until after they give their statement to police. Such a defendant should be expected to move to exclude their statement on the ground that their waiver of rights was not knowingly and intelligently made. The defendant should also be expected to testify at the hearing on their motion and explain their misunderstanding of their rights. Here, Li testified that there was "much [he] did not understand" during his interview, but he did not specify that he misunderstood his rights. This is a crucial omission that cuts against his assertion that he did not understand his rights.

The recorded interview and Li's testimony reveal no basis to conclude Li's *Miranda* waiver was anything other than knowing, intelligent, and voluntary. To the contrary, they show that Li understood his rights and validly waived them. The trial court properly denied his motion to exclude his statement to Horn.

## IV. First degree murder instruction

A trial court "must only give … instructions which are supported by substantial evidence[.]" (*People v. Hartland* (2020) 54 Cal.App.5th 71, 77.) Li contends the trial court should not have instructed the jury on first degree murder because sufficient evidence did not support that offense. He incorporates the arguments he makes in connection with his prior sufficiency of the evidence claims. As we have already explained, sufficient evidence supported his conviction for first degree murder. Thus, sufficient evidence necessarily supported instructing the jury on that offense.

## V. Duty to instruct on voluntary manslaughter

Li argues the trial court erred in denying his request that the jury be instructed on voluntary manslaughter under a heat of passion theory. We disagree.

23.

### A. Applicable law

" ' "[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged *and shown by the evidence to have been committed*.' [Citations.]" 'Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 718.) "A trial court must instruct a jury on lesser included offenses when the evidence raises questions regarding whether every element of a charged offense is present. [Citation.] No instruction on lesser included offenses is required if there is no evidence that there was any offense less than that charged. Instructing the jury on a lesser included offense is not required when the evidence supporting such an instruction is weak, but ' " 'whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury,' " ' such an instruction is required. [Citation.] Whether the evidence is substantial is tested by considering whether a jury would conclude the lesser but not the greater offense was committed." (*People v. Vargas* (2020) 9 Cal.5th 793, 827 (*Vargas*).) "[W]e review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

" 'Murder is the unlawful killing of a human being … with malice aforethought.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) "Voluntary manslaughter, a lesser included offense of murder, is defined as the unlawful killing of a human being without malice. [Citations.] Manslaughter instructions are warranted when substantial evidence exists to support a jury's determination that the killing was committed in the heat of passion and thus does not constitute a first degree murder." (*Vargas*, *supra*, 9 Cal.5th at p. 827; see *People v. Smith* (2018) 4 Cal.5th 1134, 1163.)

24.

" 'Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.' [Citation.] Heat of passion killing is distinct from malice murder because thought in some form is necessary 'to form either an intent to kill or a conscious disregard for human life.' [Citation.] A heat of passion killing … is one caused by an unconsidered reaction to provocation rather than the result of rational thought. If reason ' " 'was obscured or disturbed by passion' " ' to so great a degree that an ordinary person would ' " 'act rashly and without deliberation and reflection,' " ' … that killing arose from ' " 'passion rather than from judgment.' " ' (*Vargas*, *supra*, 9 Cal.5th at pp. 827–828; see *People v. Soto* (2018) 4 Cal.5th 968, 974; *People v. Avila* (2009) 46 Cal.4th 680, 705.) "Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

" 'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively…. "[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances"….' " (*People v. Rountree* (2013) 56 Cal.4th 823, 855.) " 'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection…. [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' [Citation.] '[P]rovocation is

25.

sufficient not because it affects the quality of one'' thought processes but because it eclipses reflection.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 650.)

### B.    Analysis

Li argues that the evidence of a "potentially intimate relationship" with Wang, coupled with his statement to Sergeant Horn that Wang told him on February 5 that she was leaving for New York, constitutes substantial evidence that he killed Wang in the heat of passion. We disagree. This evidence may be relevant to proving Li's motive to kill Wang, but it does nothing by itself to prove he was provoked to act rashly and without reflection. Indeed, there is no evidence at all of Li's demeanor or emotional state at the time of the killing. A person may kill out of some strong emotional response like jealousy or anger stemming from trouble in a romantic relationship, but that alone does not prove provocation for voluntary manslaughter purposes. Substantial evidence did not support an instruction on the heat of passion form of voluntary manslaughter, and the trial court was correct to not so instruct the jury.

## VI.    Ineffective assistance of counsel

Li also argues his trial counsel was ineffective in five ways. We reject his arguments.

### A.    Legal standard

The Sixth Amendment guarantees the " 'right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [104 S.Ct. 2052] (*Strickland*).) "A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice." (*Buck v. Davis* (2017) 580 U.S. 100, 118 [137 S.Ct. 759]; see also *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*).) A deficient performance is one in which counsel fell below an objective standard of reasonableness

26.

under prevailing professional norms.  (*People v. Arredondo* (2019) 8 Cal.5th 694, 711 (*Arredondo*).)

There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  (*Woods v. Donald* (2015) 575 U.S. 312, 315 [135 S.Ct. 1372]; *People v. Stanley* (2006) 39 Cal.4th 913, 954.)  There is a corresponding strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment.  (*Cullen v. Pinholster* (2011) 563 U.S. 170, 196 [131 S.Ct. 1388]; *People v. Padilla* (1995) 11 Cal.4th 891, 935, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)  Courts will defer to counsel's reasonable tactical decisions.  (*Arredondo*, 8 Cal.5th at p. 711; see also *Cullen*, at p. 195.)  Prejudice occurs where there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant.  (*Strickland*, *supra,* 466 U.S. at p. 694; *Stanley*, at p. 954.)  In turn, a "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  (*Strickland*, at p. 694; *Stanley*, at p. 954.)

Ineffective assistance of counsel claims should generally be pursued through habeas corpus proceedings.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–268.)  This is because on direct appeal, a court may find deficient performance only if:  (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  (*Johnsen, supra,* 10 Cal.5th at p. 1165; *Mai*, at p. 1009.)  If counsel's tactics or strategic reasons for challenged decisions do not appear on the record, courts will not find ineffective assistance of counsel unless there could be no conceivable reason for counsel's acts or omissions.  (*Johnsen*, at p. 1165.)  Given this framework, "[r]arely is ineffective assistance of counsel established on [direct] appeal since the

27.

record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)

### B. Li's claims

#### 1. *Defense counsel's statements during voir dire*

Li first claims his counsel was ineffective for making a statement during voir dire which suggested that if Li were to testify at trial, his testimony would be incriminating. Li did not testify at trial, but he claims his counsel's statement was prejudicial just the same because it undermined his defense theory that someone else killed Wang and threatened him to get rid of her body. We reject his claim for failure to show prejudice from counsel's statement.

During voir dire, one of the prospective jurors said he understood Li's "right to stay silent if he would like to, but I feel like it would impact my decision if he were to speak and just hear him defend himself." Defense counsel asked him, "To the extent that you don't think you could be an impartial juror on this case?" The prospective juror said, "Yeah." Defense counsel said:

> "Yes. Okay. And I appreciate that because I can't call a client to testify against himself. I can't. [The prosector] can't. The judge can't. Only one person on the planet can make that decision, the defendant."

This is the statement Li complains of. He contends the phrase "testify against himself" suggested to the jury that his testimony would be incriminating. And even though he did not testify, his counsel's poor choice of words prejudiced him because his "entire defense rested on the theory that someone else had killed Ms. Wang and [he] had only driven her body to Merced." He asserts: "While the evidence presented was consistent with this theory, the jury's belief that Mr. Li's testimony would undermine his defense would cause them to foreclose consideration of this theory." He claims that, but for his counsel's prejudicial statement, "the jury would have had no reason to doubt [the

28.

defense's] theory of the case and, therefore, … it is reasonably probable that Mr. Li would have been acquitted."

To help explain why defense counsel's challenged statement likely did not affect the jury, we produce other statements from voir dire for context. The day before the challenged statement, defense counsel asked a group of 18 prospective jurors if any of them believed the defense should have to prove anything at trial, and multiple jurors raised their hands. Counsel called on one of the prospective jurors, who expressed that the defendant should try rebutting strong pieces of evidence from the prosecution's case. Another prospective juror said they would like to hear from Li "[i]f he's willing to talk." Counsel said:

> "Okay. Let's say that you don't hear from William Li. You hear a lot of stuff from the prosecutor. He puts on his evidence. You hear a lot of things over two weeks, and at the end of the trial, you really like to hear from my client. You've been looking at him for two weeks. He's been sitting in a suit for two weeks. You'd like to hear from him. *And as his attorney, I can't call him to testify*. No one can. He has to decide.

> "And I stand up and I say, 'Judge, my client's exercising his right to remain silent.' You don't get to hear from him. *And the judge reads the law to you that says you cannot even think about the fact that he chose to remain silent*. It's in the Fifth Amendment of the Constitutional Rights where he can exercise his right to remain silent. So on the one hand, you really wanted to hear from him. You didn't get that chance. Are you going to hold that against him?" (Italics added.)

The prospective juror said they would not hold Li's decision to not testify against him because "that's his right."

Later that day, the prosecutor was questioning a prospective juror about how defense counsel earlier spoke about the privilege against self-incrimination and the prosecution's burden of proof. The prosecutor mentioned that that particular prospective juror earlier said they might hold Li's decision to not testify against him. The prosecutor asked how them how they would feel if Li "exercise[d] his constitutional rights to remain

29.

silent and not testify" and the judge instructed that his silence cannot be considered for any purpose. The juror admitted they would consider Li's decision to not testify.

The prosecutor later that day questioned another prospective juror about the presumption of innocence, the prosecution's burden of proof, and "the defendant's Fifth and Sixth Amendment rights and privilege of self-incrimination not to testify [*sic*]." The prosecutor noted that prospective juror earlier said they would want to hear from Li, and the prospective confirmed that. The prosecutor followed up, "If [Li] chooses to exercise his rights and not testify, is that going to be a strike against him in your mind? It is something—that judge will instruct you. You can't consider that." The prospective juror admitted it would be something "in the back of [their] mind why he didn't want to defend himself."

Besides these statements from the attorneys during voir dire, the trial court instructed the jury that Li "has an absolute constitutional right not to testify" and that it could "not consider, for any reason at all, the fact that the defendant did not testify."

The attorneys' other statements during voir dire accurately emphasized the point that the jury could not consider Li's decision not to testify for any reason, and the jury instruction on the defendant's right not to testify authoritatively drove that point home. Besides the one time that Li complains of, defense counsel never again said that he could not tell his client to "testify against himself." Considered in context of the rest of voir dire and the jury instruction, we find it highly unlikely the jury interpreted the challenged statement as an inadvertent admission—a Freudian slip—of Li's guilt. That is to say, we find no prejudice as there is no reasonable probability of a different outcome but for defense counsel's inartful statement.

### 2. *Failure to cross-examine some witnesses*

Under the heading of Li's opening brief titled "Lack of Cross Examination" is just one sentence: "Trial counsel only cross examined ten of the People's 29 witnesses."

This is no argument. He does not explain why it was wrong of his counsel to not cross-examine the other 19 witnesses. We reject whatever argument he had in mind here.

### 3. *Ineffective cross-examination*

Li also argues that "[w]hat cross examination trial counsel did engage in was often superficial, perfunctory, or misguided." He has not shown prejudicial ineffective assistance.

Li complains that his counsel "only asked 22 questions of Dr. Super" and "emphasize[d] [Wang's] death could [have] been 'very violent' for 'more than six minutes.' " Li asserts it was "unfathomable" that he used his "inexplicably limited cross examination to … highlight the violent nature of a strangulation for the jury." But the record reveals a reasonable potential tactical purpose for asking about the violent nature and length of the fatal assault. Counsel could have been trying to elicit expert testimony to support an argument that the killing was committed in the heat of passion—without premeditation and deliberation.. Indeed, counsel asked Super, "A lot of rage, a lot of emotion, potentially, involved, correct?" And Super answered, "Potentially. Yes."

Li also mentions counsel's questioning of Wang's friend George Tam about how he (Tam) met her at a party at a restaurant attended by eight to 10 people, but he does not assert any problems with this questioning. Whatever he may be claiming, we reject it.

Li's next claim pertains to evidence that he says shows S.H., a prosecution witness, was biased against him. In his new trial motion, Li produced video evidence showing S.H. vandalizing vehicles of Li's customers about a month and a half before S.H. testified at trial. Li claims his counsel should have introduced this evidence or cross-examined S.H. about his vandalism. We reject this claim because the record is silent as to why counsel did not introduce this evidence or cross-examine S.H. about it, and it is not the case that there simply could be no reason for failing to do so. As the People point out, it is possible that counsel investigated and learned that the vandalism

31.

had nothing to do with Li and instead was related to problems between S.H. and Li's sister and brother-in-law, who owned the shop. There is no basis for finding counsel performed deficiently in this respect.

Finally, Li complains that his counsel "failed to get meaningful testimony from [Jing Huang]" related to "his theory that Ms. Wang's death may have resulted from prostitution-related violence." But he does not say what testimony Huang could have offered that would have helped him. He thus has failed to show deficient performance.

### 4. *Handling of paint chip expert testimony*

Li next argues his counsel was ineffective for failing to object to the testimony of People's paint chip expert, Gina Williams. He asserts counsel should have tried getting Williams's testimony on the paint chip evidence excluded by requesting an Evidence Code section 402 hearing and challenging her methodology in examining the evidence. But he does not explain how her methodology was problematic or otherwise explain any grounds the trial court would have had for excluding her testimony.

Failing getting her testimony excluded, Li contends his counsel should have cross-examined her as to how she came to determine that the paint chips found on Wang's body were paint.[7] But Li does not explain how cross-examination would have benefitted him. We agree with the People the record does not foreclose that defense counsel made a rational tactical decision not to cross-examine Williams, as doing so would only have allowed her to bolster her testimony in a way that would not have assisted Li.

### 5. *Failing to move for a judgment of acquittal*

Lastly, Li contends his counsel was ineffective for failing to move for a judgment of acquittal under section 1118.1 on the basis of the People's failure "to establish that any crime even occurred" and that "the People's evidence in this case was insufficient to

---

[7] His counsel did not cross-examine Williams at all.

justify [Li's] conviction for first degree murder." Section 1118.1 allows a motion for a judgment of acquittal in a case tried before a jury at the close of the evidence on either side and before the case is submitted to the jury for decision. The court must grant the entry of a judgment of acquittal of one or more charged offenses if the evidence before the court is insufficient to sustain a conviction on appeal. (§ 1118.1.) Li's claim is premised on the same sufficiency of the evidence of corpus delicti argument he raised earlier in his opening brief. For the same reasons we rejected that argument, we reject this one as well.

## DISPOSITION

The judgment is affirmed.


                                                                SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P. J.


DE SANTOS, J.

33.